**E. L. WIEGAND DIVISION, Emerson Electric Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, (UAW), LOCAL 1020, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 79–2836, 80–1399.

United States Court of Appeals, Third Circuit.

Argued Nov. 7, 1980.

Decided April 13, 1981.

Rehearing and Rehearing In Banc Denied June 25, 1981.

As Amended August 3, 1981.

Kelley, Drye & Warren, New York City, for petitioner E. L. Wiegand Division, Emerson Electric Co.; Eugene T. D'Ablemont, Martin D. Heyert, Patricia Hytten Sachs, John F. Gibbons (argued), New York City, of counsel.

Michael B. Nicholson (argued), Asst. Gen. Counsel, Detroit, Mich., for petitioner, UAW Local 1020; John A. Fillion, Gen. Counsel, Leonard R. Page, Associate Gen. Counsel, Detroit, Mich., of counsel.

Carol A. De Deo, Susan L. Williams (argued), N. L. R. B., Washington, D. C., for respondent, N. L. R. B.; William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., of counsel.

Before ADAMS and SLOVITER, Circuit Judges, and BROTMAN, District Judge.*

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

This matter is before us on cross-petitions for review filed by the Union and employer and the NLRB's cross-application for en-

---

* Hon. Stanley S. Brotman, United States District Court Judge for the District of New Jersey, sitting by designation.

forcement. It arises from the employer's action in terminating payment of sickness and accident (hereafter "S and A") benefits to disabled employees during a strike by the bargaining unit of which they were members. The National Labor Relations Board found that the employer's action constituted an unfair labor practice and ordered that the employer make such retroactive payments to each employee disabled as of the beginning of the strike for the period until that employee actively participated in strike activity or showed public support for the strike. We find substantial evidence in the record to support the finding of the Board that the employer committed an unfair labor practice in terminating S and A benefits to employees when the strike began. We cannot, however, approve the Board's order insofar as it permits payments to be halted to disabled employees on the basis of public support of the strike, and to that extent grant review and modify the Board's order.

## II.

On October 31, 1977 the collective bargaining agreement between Local 1020 of the UAW (the Union) and the E. L. Wiegand Division, Emerson Electric Company ("the employer" or Wiegand) expired. As of that date, 23 of the unit's approximately 1100 employees were receiving S and A payments from the employer under a plan established by the 1971–1974 and the 1974–1977 collective bargaining agreements.[1] The plan provided for payments by the employer to disabled hourly employees of sixty percent of the employee's average weekly wages for up to thirty-nine weeks of disability, the length of time of such payments dependent on seniority. "Disability" was defined by reference to a written benefits policy as meaning that the employee is "prevented, solely because of injury or disease from engaging in his regular or customary occupation and is performing no work of any kind for compensation. . . ."

Negotiations begun in the fall of 1977 were unsuccessful, and the Union called a strike to commence on November 1. During a negotiation session on the afternoon of October 31, the Union requested that the employer continue to pay premiums for hospitalization, insurance and major medical on behalf of striking union members, with the understanding that the Union would reimburse the employer for those premiums. That evening, in the final bargaining session, the employer proposed that it pay and be reimbursed for these premiums and for continued S and A payments to employees then on sick leave. The S and A payments had not previously been raised in the negotiations. The Union asserted that employees on sick leave were not participants in a strike and that the employer had a legal obligation to continue making such payments. The employer responded that S and A payments would be halted "if [the Union] went out on strike."

On November 1, 1980 the Union went out on strike and the employer immediately halted all disability payments. The strike was 100% effective. During the strike's four month duration, the circumstances with respect to the 23 disabled employees varied. Several of the disabled employees contacted the employer to inform it that they were still disabled and not participating in the strike. Seven of the disabled employees sent medical certification to the employer that they were recovered and able to return to work. At least one of those employees obtained certification of his ability to return to work and later was seen on the picket line. Other employees who were disabled as of October 31, 1977 but able to work at the conclusion of the strike were identified as on the picket line or otherwise engaged in strike activity.[2] At least one

---

1. The Board and the parties refer to 23 employees receiving Sickness and Accident (S and A) benefits. The ALJ referred to 22 employees. The exact number can be determined at the compliance proceedings.

2. On the record before us we cannot determine which of such participants in the strike were still medically disabled at the time of their strike activity. The parties in these cross-petitions are agreed that such employees will be identified in the compliance phase of these proceedings.

employee was in the hospital before the strike began and remained there for a substantial time after the strike ended.

After the disabled employees were without S and A payments for six weeks, the Union modified its policy not to pay strike assistance to employees on sick leave. It announced that it would extend strike assistance to them to alleviate the hardship caused by the employer's action in terminating benefits, contingent on reimbursement by the employees from any later Board award against Wiegand. The Union then filed charges with the Board, and the General Counsel of the Board filed the complaint which led to these proceedings.

The strike continued until February 28, 1978. As part of the strike settlement, the parties agreed that "all pending grievances, charges, civil and/or criminal proceedings arising out of or in relation to actions taken or occurring during the strike ... shall be withdrawn with prejudice or the parties shall cause them to be so withdrawn." When the strikers returned to work, the employer resumed payment of S and A benefits to those employees who were still disabled.

The administrative law judge concluded that the employer committed an unfair labor practice within the meaning of sections 8(a)(1) and (3) of the Act by withholding payment of S and A benefits from disabled employees. The administrative law judge reasoned that these disabled employees were not in a position to choose to withhold labor on the day the strike began; only when they were again able to work did they have the choice and could they become strikers. Each disabled employee was therefore entitled to S and A payments from the date on which the strike began to the date on which he or she was well enough to return to work. The administrative law judge also refused to dismiss the complaint notwithstanding the provision in the strike settlement agreement stipulating that all grievances, charges, and proceedings would be withdrawn. He relied on section 10(a) of the Act and cases interpret-

ing it which held that the parties cannot divest the Board of jurisdiction over unfair labor practices by private agreements.

The Board affirmed the rulings, findings and conclusions of the administrative law judge and adopted his recommendations except with regard to the remedy ordered. The Board stated that, "For all practical purposes, any employee, disabled or sound, who affirmatively demonstrates his support of the strike by picketing or otherwise showing public support for the strike, has enmeshed himself in the ongoing strike activity to such an extent as to terminate his right to continued disability benefits." 246 N.L.R.B. No. 162, slip op. at 4, 103 L.R.R.M. 1073, 1074, [1979–80] N.L.R.B. Dec. (CCH) ¶ 16,619 at 31,033 (1979). Therefore, the Board determined that payments should end either on the date on which an employee was well enough to work, or when the employee had actively participated in strike activity or shown public support for the strike, whichever was earlier.

The employer petitions for review and contends that the Board erred in refusing to dismiss the complaint, that the Board lacked substantial evidence for its finding of an unfair labor practice, and that it abused its discretion in overruling a prior decision with retroactive effect. The Union petitions for review on the ground that the Board improperly declined to order payments for the periods after employees showed public support for the strike but before they were well enough to work. The Board requests enforcement.

### III.

As an initial matter we must consider whether the Board properly denied the employer's motion to dismiss the unfair labor practice charges on the basis of the strike settlement agreement in which the Union agreed to the withdrawal of all charges relating to the strike. Assuming arguendo that the employer correctly construes the agreement, its operation is subject to section 10(a) of the National Labor Relations

Act which provides that the Board's power to remedy unfair labor practices shall not be affected "by any other means of adjustment ... that has been or may be established by agreement, law, or otherwise ...." 29 U.S.C. § 160(a) (1976).

■ By well established principle, private contracts may not be used to legitimate unfair labor practices nor to divest the Board of jurisdiction over such practices. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *J. I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). In *J. I. Case Co.*, the Supreme Court affirmed that the Board acts as a public body charged in the public interest with the duty of preventing unfair labor practices, and stated, "[w]herever private contracts conflict with its functions, they obviously must yield or the Act would be reduced to a futility." *Id.* at 337, 64 S.Ct. at 580. *In International Union of Electrical, Radio and Machine Workers, Local 613 v. NLRB*, 328 F.2d 723 (3d Cir. 1964), this court rejected the company's argument that a term in its post-strike collective bargaining agreement restricted the Board's power to enter prospective relief only and divested it of power to enter an order of reinstatement with back pay. We held that the power of reinstatement with back pay was exercised in vindication of the public policy encompassed by the Act, and thus "the rights of discriminatorily discharged employees under the statute are not subject to private adjustment. Such an adjustment, if made, cannot bar the Board's exercise of its statutory authority." *Id.* at 727. *See also Lodge 743, International Association of Machinists v. United Aircraft Corp.*, 337 F.2d 5, 8–9 (2d Cir. 1964), *cert. denied*, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

The policy reflected in the precedent and expressed in section 10(a) prevents a party from engaging in unfair labor practices that may coerce a favorable labor agreement and then insulating itself from Board sanctions by exculpatory provisions in that agreement. The Board properly refused to dismiss the complaint and proceeded to the merits, as we also do.

IV.

The first issue on the merits of this appeal is whether substantial evidence supports the Board's conclusion that the employer, Wiegand, committed an unfair labor practice. The Board's conclusion that an unfair labor practice occurred is based on two findings. First, it found that the disability payments were accrued benefits rather than current wages. Second, it found that these benefits were cut off by Wiegand with the intention of coercing and restraining protected union activity with respect to the strike through the imposition of a sanction against certain employees if other employees engaged in strike activity.

The parties agree that these findings, if correct, would support a conclusion that an unfair labor practice was committed. The Supreme Court held in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), that a refusal to pay accrued vacation benefits to those participating in an economic strike was an unfair labor practice, even absent proof of an improper motivation by the employer. The Court found two principles controlling:

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives

since proof of motivation is most accessible to him.

*Id.* at 34, 87 S.Ct. at 1798 (emphasis in original).

The Supreme Court had held earlier in *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), that the Board might properly infer the existence of discriminatory motivation or improper intent without evidence of illegal subjective intent. Where the employer has engaged in conduct that is "inherently discriminatory or destructive" by its very nature, the employer must be held to intend the consequences which foreseeably and inescapably flow from it. *Id.* at 228, 83 S.Ct. at 1145. The. employer may offer evidence of proper motivation, but it must prove a business purpose of overriding significance. *Id.* at 231, 83 S.Ct. at 1147. In *Erie Resistor*, the Court found that a grant of additional seniority (super-seniority) to employees working through a strike could not be justified as necessary to continued operation during the strike.

Although acknowledging these legal principles, the employer argues that the S and A benefits at issue here are wages rather than accrued benefits, and that the record cannot support a conclusion of antiunion motivation. Our standard of review is whether the Board's findings are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). As the Court has frequently noted, the Board has been delegated the function of balancing the conflicting interests of employer and employees, subject to limited judicial review. *NLRB v. Erie Resistor, Corp., supra*, 373 U.S. at 236, 83 S.Ct. at 1149.

### A.

■ The relevant precedents establish the posts between which this issue falls. On one side, as the employer argues, it is not required to finance a strike against itself by paying wages or other similar expenses. *General Electric Co.*, 80 N.L.R.B. 510 (1948) (wages); *Towne Chevrolet*, 230 N.L.R.B. 479 (1977) (insurance policy premiums); *Ace Tank and Heater Co.*, 167 N.L.R.B. 663 (1967) (medical insurance premiums). On the other side, an employer may not withhold payment of already earned or accrued benefits contingent upon the cessation by employees of a legitimate economic strike. This situation has arisen most frequently in the context of accrued vacation benefits. *See NLRB v. Great Dane Trailers, Inc., supra*, 388 U.S. at 32, 87 S.Ct. at 1796; *Allied Industrial Workers, Local 289 v. NLRB*, 476 F.2d 868, 875–876, 878 (D.C. Cir.1973); *NLRB v. Jemco, Inc.*, 465 F.2d 1148 (6th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 911, 34 L.Ed.2d 690 (1973); *NLRB v. Frick Co.*, 397 F.2d 956 (3d Cir. 1968). *Accord, Indiana & Michigan Electric Co.*, 236 N.L.R.B. 986 (1978) (employer unlawfully withheld accumulated leave pay until employee ceased strike), *enforced without opinion*, 610 F.2d 812 (4th Cir. 1979).

In determining whether the S and A benefits in question fall most closely to one side or the other, the Board adopted the findings and conclusions of the ALJ that:

the benefits being paid the sick people were not compensation for contemporaneous delivery of services at all, but rather payment for past work performed. Their entitlement to that money depended not one wit upon their working at that time. That it was deferred payment for work—albeit conditional upon their being sick and disabled—is true, but for work performed by them in the past, not in the present. Indeed, this is why the man who worked 30 years received more weeks of S and A benefits while sick than the man who had only performed as an employee a year, or two, or three. If the sick man must come out of the hospital and work during a strike to receive a benefit he sweated for in prior years, must the retiree, who is collecting the pension he earned over 35 years, also come back, merely because the working complement is striking at the moment? To ask the question is to answer it.

■ Accrued benefits, in contrast to wages, are deferred compensation for work

already done. They may take the forms of wages due for past work, vacation time, seniority rights and other conditions of employment linked to past service. *E. g., NLRB v. Darling & Co.,* 420 F.2d 63 (7th Cir. 1970), *enforcing* 170 N.L.R.B. 1068 (1968) (severance pay); *Swift Service Stores, Inc.,* 169 N.L.R.B. 359 (1968) (Christmas bonus). Such benefits may be defeasible; for example, vacation time may be forfeited if not taken within a calendar year. The test in deciding if benefits have accrued is whether they are due and payable on the date on which the employer denied them. *Allied Industrial Workers, Local 289 v. NLRB, supra,* 476 F.2d at 876.

■ The S and A benefits in this case have the distinguishing characteristic of accrued benefits. The ALJ and the Board found, that the length of the period of payments of benefits is tied to the employee's length of service[2a]. Although they are conditional on the employee suffering and continuing to suffer a disabling illness or injury, they do not depend on any return to work or on any future services to the employer.

Wiegand contends that the continued payment of benefits is conditional also on no strike occurring because the applicable benefit plan defines disability as the condition of being unable to work "solely because of" illness or injury. It argues that here the employees would not have worked during the strike because they were union members and because the strike was fully effective. Since they were not absent from their jobs solely because of physical disability, it claims they are not entitled to benefits.

We agree with the Board that the employer's reading of the disability definition is not tenable. The plan defines disability in terms of the employee being prevented from engaging in his or her "regular and customary occupation" because of illness or injury. This definition turns on the physical capacity to carry on one's occupation. Nor can we accept the employer's suggestion that payment of S and A benefits is dependent upon the availability of work for that particular employee. It has pointed to no language limiting the right to benefits in such a way.

In short, nothing in the record of this case indicates that the benefit plan contemplated that employees who were incapable of performing their usual occupations for the employer would not be deemed disabled for the purposes of receiving benefits. Rather, if an employee is certified as disabled, the only relevant consideration within the period for which benefits are due is whether the employee has again become able to work. Therefore, we find substantial basis supporting the Board's conclusion that the S and A benefits were accrued benefits and not wages, and were due and payable within the period of the strike.

**B.**

Wiegand contends that the Board had no basis for its conclusion that Wiegand intended to coerce and restrain protected activity by its termination of the S and A benefits. Pointing to evidence of its announced reliance on *Southwestern Electric Power Co.,* 216 N.L.R.B. 522 (1975), Wiegand claims that its action can only be construed as properly undertaken in good faith reliance on the advice of its counsel.

---

**2a.** The ALJ in finding the S and A benefits were accrued as being "deferred payment for work … performed by [employees] in the past", also stated "this is why the man who worked 30 years received more weeks of S and A benefits while sick than the man who had only performed as an employee a year, or two, or three." A7. All of the findings were adopted by the Board. A29. The one Board member who dissented from the Board's result disagreed only with the Board's failure to order the full remedy recommended by the ALJ. In this separate dissenting opinion, member Jenkins specifically referred to the accrued nature of the S and A benefits, and stated "Respondent's disability plan operates as a form of self-insurance whereby employees, who as a result of sickness or accident are unable to work, are provided with 60 percent of their income for periods ranging from 1 to 39 weeks, depending on their seniority. As the extent of this benefit is directly a function of employee seniority, it is apparent that the benefit is a form of compensation for past services and is fully vested upon the commencement of the employee's actual disability." A35.

In its brief filed in this court, the employer, while arguing that the A and S benefits were not deferred payments, nevertheless stated, "Contrary to the ALJ (7), *seniority measures only the length of an employee's A & S benefits,* if he has the right to receive them." Wiegand's brief, p. 31 (emphasis added), thus conceding the nexus between the length of the benefits and the past services.

■ Under *NLRB v. Erie Resistor Corp., supra,* an intent to encroach upon protected rights may be found when discriminatory consequences foreseeably flow from an action; it is unnecessary to show specific illegal intent. Similarly, the test of coercion or interference with protected rights under Section 8(a)(1) is whether the action undertaken by the employer reasonably tends to restrain or interfere with the employee's exercise of those rights. *NLRB v. Clearfield Cheese Co.,* 322 F.2d 89, 94 (3d Cir. 1963). Under *NLRB v. Great Dane Trailers, Inc., supra,* the Board may find the necessary intent even if the employer shows its conduct had a proper motivation, so long as the impact of the discrimination by the employer is "inherently destructive" of section 7 rights. Only when the adverse effect is "comparatively slight" must antiunion motivation be proven as a separate element of the unfair labor practice if the employer raises the issue.

Where, as here, the employer's action affected a benefit that could amount to as much as 45% of an employee's annual income, one might argue that it is so destructive of important rights that subjective intent could be deemed irrelevant. However, we need not decide the issue of intent on that basis because the Board has specifically found antiunion motivation in this case, finding that "[Wiegand's] announcement of the termination of these benefits was intended to coerce and restrain the protected union activity with respect to the strike, by imposing a sanction against certain unit employees if others in the unit engaged in strike activity." 246 N.L.R.B. No. 162, slip op. at 2, 103 L.R.R.M. at 1073. The Board expressly relied on Wiegand's "declaration that these benefits would not be paid to employees who would otherwise receive them came at a time when a strike at its facility was imminent, but before there was any showing of how widespread the strike would be, and before [Wiegand] was aware that any of the employees who were unable to work ratified or actively supported the strike." *Id.* The Board also relied on the fact that "[Wiegand] terminated these benefits immediately upon the commencement of the strike despite a union representa-tive's clear protest that the individuals who were unable to work were not participants in any strike." [3] *Id.* The context of the employer's decision as conveyed in the final negotiation session adequately supports the Board's conclusion that antiunion motivation was present.

Although Wiegand introduced evidence of its having proceeded on the basis of legal precedent for its actions, this evidence does not invalidate the inference drawn by the Board. Such evidence is self-serving and may be weighed together with all other evidence by the Board. As this court has said in the context of unlawful discharge cases,

[t]here is clearly no obligation on the Board to accept at face value the reason advanced by the employer. The concurrent existence of an otherwise valid reason for the discharge of an employee does not preclude a factual determination that his discharge was discriminatory if it appears from a preponderance of evidence, and the reasonable inferences drawn therefrom, that the discharge was in fact motivated by the employer's opposition to the employee's union activities.

*NLRB v. Buitoni Foods Corp.,* 298 F.2d 169, 174 (3d Cir. 1962). *Accord, NLRB v. G & J Co.,* 346 F.2d 960 (3d Cir. 1965). *See also NLRB v. Garry Manufacturing Co.,* 630 F.2d 934, 945 (3d Cir. 1980) (In spite of a concurrent permissible justification, an action is an unfair labor practice if it is partly motivated by reaction to the employee's protected activity); *Edgewood Nursing Center, Inc. v. NLRB,* 581 F.2d 363, 368 (3d Cir. 1978). This is equally applicable where an employer offers a rationale for other discriminatory action. Therefore, even if Wiegand might properly have relied on *Southwestern Electric* to immunize its action, a question we consider hereafter, the Board might still conclude that Wiegand did not in fact do so. We find substantial evidence to support the Board's conclusion that Wiegand intended to coerce and restrain protected activity.

V.

Wiegand vigorously asserts that the Board acted improperly in retroactively

---

3. The record also includes evidence that Wiegand attempted to use its threatened cutting off of disability benefits to secure concessions from the union on the conduct of the strike, and itself brought up the question of these benefits at the last bargaining session without any earlier indication of its position that these were not in fact accrued benefits. Appendix at 91-92, 200–05.

changing its rule in *Southwestern Electric Power Co.*, 216 N.L.R.B. 522 (1975). In its decision in this case, the Board expressly overruled *Southwestern Electric* to the extent it was inconsistent with the result in this case. While we believe that under the circumstances of this case, application of the NLRB's new approach would not be arbitrary or capricious, we also believe that Wiegand misperceives both the relevance and the effect of the Board's reference to *Southwestern Electric* in the decision here.

In *Southwestern Electric* the Board, acting through a three member panel, held that "on the basis of the facts presented, [the employer] did not violate the Act by treating as strikers the six unit employees on sick leave at the beginning of the strike." *Id.* at 522. The decision, by a 2 to 1 vote, was based on the reasoning that the employer had no way of knowing for certain that the employees on sick leave, all of whom were members of the Union, did not support the strike activities of their colleagues. Since the Board agreed with the ALJ that the employer's belief that the employees in question ratified and supported the strike was reasonable, the complaint against the employer was dismissed. The Board expressly rejected a claim that cancellation of sick leave benefits represented discrimination against union members, saying that there was "no basis" in the case upon which to predicate such a finding. Member Fanning, then Acting Chairman, dissented on the ground that the majority opinion would require that employees on sick leave disavow legal strike action in order to receive their sick pay, which would constitute a clear violation of the section 7 rights of the employees.[4]

In the present case the Board, by a 3 to 1 majority on this issue, took the opportunity

to express its agreement with Chairman Fanning's dissenting opinion in *Southwestern Electric* that the employees had a section 7 right to refrain from declaring their position on a strike while they were medically excused. 216 N.L.R.B. at 523. The Board here stated, "an employer may no longer require its disabled employees to disavow strike action during their sick leave in order to receive disability benefits. To allow the termination of such benefits to certain employees as a result solely of the strike activities of others is to penalize the employees who have not yet acted in support of the strike." 246 N.L.R.B. No. 162, slip op. at 3, 103 L.R.R.M. at 1073. One member of the Board dissented, expressing his adherence to the analysis in *Southwestern Electric.*

■ Retroactive application of newly adopted administrative rules or interpretations is not *per se* arbitrary. Instead, "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). *See also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294–95, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974). In essence, the courts analyze whether the inequity of retroactive applications is counterbalanced by sufficiently significant statutory interests.[5] *See, e. g., Retail, Wholesale and Department Store Union v. NLRB,* 466 F.2d 380 (D.C.Cir.1972); *NLRB v. Majestic Weaving Co.,* 355 F.2d 854 (2d Cir. 1966).

In this case, even were the Board's order requiring payment of S and A benefits to those employees whose disability continued during the strike to be considered as a retroactive application of a changed inter-

---

4. Section 7 provides:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in § 158(a)(3) [section 8] of this title."
   29 U.S.C. § 157 (1976).

5. In *Retail, Wholesale and Department Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir. 1972), the court enumerated the following factors to be considered in resolving the problem of retroactive application of a Board holding: (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely occupies a void in an unsettled area of law, (3) the extent to which the party against whom the new holding is applied in fact relied on the former rule, (4) the degree of the burden imposed, and (5) the statutory interest in application of this new rule.

pretation, we would not find its impact to be inequitable. The employer is merely being required to pay an accrued benefit, a form of deferred compensation for service it has already received. The effect therefore does no more than prevent unjust enrichment to an employer by its retention of benefits due to its employees.

Another apparent difference between this case and the decision in *Southwestern Electric* is the nature of the benefit that was denied. In that case, the "sick pay" consisted of "wages being paid to six employees pursuant to a wage continuation policy whereby employees who are sick and unable to work continue to receive, for specified periods and under certain conditions, the wages they would have earned had they been working." 216 N.L.R.B. at 524 (Decision of the ALJ). Therefore, the issue was whether discontinuance of benefits comparable to wages during a strike constituted an unfair labor practice. There was no indication in *Southwestern Electric* that the sick pay was an accrued benefit. In this case, we have already decided that the benefits discontinued fall into the category of accrued benefits. Therefore, the employer had no more right to discontinue such benefits than it would have had to deny strikers their accrued vacation time.

The ALJ recognized the distinction between the case before him and that presented in *Southwestern Electric*. He found this case more analogous to the Board's decision in *Indiana & Michigan Electric Co.*, 236 N.L.R.B. 986 (1978), *enforced without opinion*, 610 F.2d 812 (4th Cir. 1979), where the Board found the employer committed an unfair labor practice by withholding leave pay due employees on the basis of work previously performed. Thus the ALJ here stated that the "employees named in this complaint had already earned their S and A benefits before the strike started."

The fact that the Board has chosen this case as the vehicle for repudiating its prior interpretation in *Southwestern Electric* cannot give the employer any basis for complaint. This case is distinguishable on its facts because of the finding by the Board of intent by the employer to coerce or restrain protected activity, a finding not made in *Southwestern Electric*.[6] The difference is illustrated by the Board's decision in *Pease Co.*, 237 N.L.R.B. 1273 (1978). There the Board found that an employer committed an unfair labor practice when it halted disability benefits notwithstanding the employee's protest of termination of benefits statement that he was not participating in the strike. The Board held that because of these facts, the case was not governed by *Southwestern Electric*, which involved the *reasonable* belief of an employer. In light of the foregoing differences the Board was justified in rejecting Wiegand's defence of good faith reliance on *Southwestern Electric*.

## VI.

Having concluded that the Board was warranted in finding that Wiegand had committed an unfair labor practice and in requiring Wiegand to pay S and A benefits to the disabled employees, we must still decide whether there is any basis for the Board's decision that such benefits can be withheld for the periods after the employees actively participated in strike activity or showed public support. We conclude that this limitation cannot be supported.

The Board justified its order that no payment of S and A benefits shall be due for the periods subsequent to any employee's active participation in strike activity or public support for such activity on the ground that such affirmative demonstration of support "enmeshed" an employee "in the

---

6. As the Board and the Union argue, the employer here had significantly different information when it announced its decision to terminate S and A benefits than the employer had in *Southwestern Electric*. This employer had received an explicit statement before the strike that employees on sick leave were not strike participants. After the termination, the employer received protests from at least some of the disabled employees who stated they were not on strike, precisely the evidence that the Board noted was absent in *Southwestern Electric*.

ongoing strike activity to such an extent as to terminate his right to continued disability benefits." 246 N.L.R.B. No. 162, slip op. at 4, 103 L.R.R.M. at 1074. It concluded that its limited remedy represented a fair accommodation between employees' rights to disability benefits without disavowing the strike and the employer's right to refuse to finance a strike against itself.

Member Jenkins dissented from the Board's failure to order the full payment of all S and A benefits during their disability period. He stated that only the employee's recovery would terminate the employer's "fully vested obligation to continue [S and A] payments for all employees on disability prior to the strike", id. at 7, 103 L.R.R.M. at 1074; that disabled employees are inherently unable voluntarily to withhold services from the employer in support of a labor dispute; and that the employer's prior commission of an unfair labor practice in terminating the benefits may have caused, and therefore excuses, the strike participation of the disabled employees.

Both petitioners attack the remedy ordered by the Board. We have already rejected Wiegand's contention that no S and A payments are proper. The Union, however, asserts that the Board's findings that these benefits were accrued, that disabled employees had non-striker status, and that employees have a section 7 right to refrain from strike action while disabled are inconsistent with the Board's determination that S and A benefits may be cut off by a showing of strike support. It argues that benefits should be continued until employees are no longer eligible or are no longer physically disabled.

■ Our review of the Board's choice of remedy is necessarily limited by deference to its administrative competence in deciding what means best serve the purposes of the NLRA. Under section 10(c) of the Act, 29 U.S.C. § 160(c)(1976), the Board, upon finding that a person has committed an unfair labor practice, shall require such person to cease and desist from its unfair labor practice and to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of the Act...." However, it is patent that the Board's remedy cannot be inconsistent with the reasoning of the decision itself, or with its still applicable principles enunciated in other cases. If it is, then its choice of the remedy may not be enforced. As we have recently said, "[i]t is our duty to insure that the Board adheres to its established criteria unless it clearly decides to modify or alter those standards." *NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 372 (3d Cir. 1980).

The Board asserts that its remedy serves the well established policy of protecting an employer from financing a strike against itself. *E. g., General Electric Co.*, 80 N.L.R.B. 510 (1948). However, the entire basis of the Board's decision was that the S and A payments were to be considered as accrued benefits. Since an employer may not deny a striking employee accrued benefits, such as vacation pay, because of his or her active participation in a strike, it follows that the employer may not deny the S and A benefits merely because of the disabled employee's approval of or participation in strike activity. The Board's reliance on its decision in *Abilities & Goodwill, Inc.*, 241 N.L.R.B. No. 5, 100 L.R.R.M. 1470, *enforcement denied on other grounds*, 612 F.2d 6 (1st Cir. 1979), is unpersuasive. In that case the Board held that an employer may avoid back pay liability by showing that the employee would not have accepted a reinstatement offer or is otherwise willfully withholding his or her services. Back pay is distinguishable from accrued benefits. Back pay is a statutory remedy that shifts the risk of loss of wages from the employee to the employer if it has committed an unfair labor practice, generally an unlawful discharge. It cannot be analogized to accrued benefits which are payments for services the employer has already received. Even though such benefits, whether disability payments, vacation pay, or previously earned wages, may provide the living expenses of those who oppose the employer, they do not represent unfair strike financing by an employer, and the Board may not justify its order on that basis.

Moreover, the Board's decision contravenes the reasoning it applied in *Abilities & Goodwill, Inc., supra,* where it refused to limit the remedy to an employee who, after being illegally discharged, engaged in strike activity. The Board was unwilling to presume the absence of a connection between the employee's conduct and the unfair labor practice. There, the Board stated, "[B]ecause the uncertainty [of the motives of the striker] is caused by the employer's unlawful conduct, we will not indulge in the presumption that the discharge itself played no part in keeping the employees out of work. Rather, it seems to us more equitable to resolve the ambiguity against the wrongdoer ...." 241 N.L.R.B. No. 5, slip op. at 5, 100 L.R.R.M. at 1471. Here where the employer's termination of the S and A benefits was found to be an unfair labor practice, it follows that such unlawful conduct may have induced strike participation and the employer should not be allowed to benefit from a presumption that its conduct did not induce the participation. *See International Union of Electrical, Radio and Machine Workers, Local 613 v. NLRB,* 328 F.2d 723, 726 (3d Cir. 1964) (Where employer commits an unfair labor practice during an economic strike, it may be required to give back pay for the time the strike was prolonged).

Furthermore, the Board's order in this case is inconsistent with its holding, still viable, that an employee who pickets during off-duty time cannot be regarded as a "striker" against whom an employer can act. *See M Restaurants, Inc.,* 223 N.L.R.B. 725 (1976); *Shoppers Drug Mart, Inc.,* 226 N.L.R.B. 901, 910 (1976); *Edir, Inc.,* 159 N.L.R.B. 686 (1966). *See also NLRB v. Circle Bindery, Inc.,* 536 F.2d 447 (1st Cir. 1976) (boycott support); *Coors Container Co.,* 238 N.L.R.B. 1312, 1319 (1978) (display of boycott signs on vehicle); *Sears, Roebuck & Co.,* 168 N.L.R.B. 955, 956–57 (1967) (boycott leafletting after hours). So long as the employee meets the work commitment to the employer, the employer cannot act against the employee for his or her off-time actions, or section 7 rights would be merely empty promises.

Obviously, the employer need not continue to pay S and A benefits once the employee is no longer disabled. Active participation in strike activity may be telling, or even presumptive, evidence of cessation of disability. However, whether such activity in fact reflects the end of the disability period may depend on the nature of the activity and the physical demands of the particular employee's job. Such details can be resolved in the compliance proceeding. On the other hand, use of the mere expression of public support for the strike by a disabled employee, such as one still in the hospital, as the basis for termination of benefits is inherently destructive of the employee's section 7 rights.

Accordingly, the Board's decision to end benefits on the basis of active participation or public support for strike activity cannot stand. It is internally inconsistent with the Board's own rationale in this case. It varies from the Board's policies as set out in previous Board decisions, and frustrates effectuation of section 7 rights.

## VII.

We have found that the Board properly concluded that Wiegand had committed an unfair labor practice and ordered payments of sickness and accident benefits, but improperly limited those payments. Accordingly, we will grant review and enter a decree modifying the order of the Board to authorize payment of sickness and accident benefits for the maximum period of each disabled employee's eligibility or for such employee's period of disability as defined in the plan, whichever is shorter. As so modified, we will enforce the order of the Board pursuant to our power under section 10(f), 29 U.S.C. § 160(f) (1976).

ADAMS, Circuit Judge, concurring.

I concur in the judgment of the Court because I believe there is sufficient evidence to support the conclusion of the National Labor Relations Board that the sickness and accident benefits (S&A benefits) were accrued and that Wiegand committed

an unfair labor practice when it terminated these benefits. Under the circumscribed scope of judicial review of Board orders, we may not substitute our judgment for that of the agency; rather, we are constrained to uphold findings supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Although I agree with the reasons expressed by the majority for upholding the Board's findings on the accrued nature of the benefits, I write separately to emphasize a finding that in my view is crucial to the resolution of several issues in this case. Significantly, the Administrative Law Judge and the Board found that the employer intentionally terminated sickness and accident benefits for the purpose of coercing and restraining the employees' protected right to engage in concerted activity.

Substantial facts support this finding of intentionally coercive anti-union animus. As the Board recounted the chronology of events, the employer declared that it would cease paying S&A benefits in direct response to a strike call by the union. The union promptly protested this decision, and informed the employer that the disabled workers were not strike participants. Despite these protestations, Wiegand persisted in cutting off the S&A benefits. The employer acted before it could have acquired any knowledge of how effective the future strike would be or whether the sick employees would ratify the strike. Under these circumstances the ALJ and the Board could have reasonably found that the employer's announcement amounted to a retaliatory threat to sanction certain workers if the other employees went on strike.

The import of the finding of coercive intent is that it serves to distinguish the present situation from that involved in *Southwestern Electric Power Co.,* 216 NLRB 522 (1975), a matter in which the Board found that the employer had not committed an unfair labor practice when it ceased paying sick leave after a strike began. Notably absent from *Southwestern Electric* is any indication that the employer

threatened to terminate benefits before the strike commenced, or that the eventual cut-off, which occurred after the strike was called, was an intentionally coercive measure. Indeed, the focus of the inquiry in *Southwestern Electric* was whether the employer acted reasonably in assuming that all workers, well or disabled, actually supported the strike. In concluding that the employer's belief was reasonable, the Board found it significant that no Southwestern employee had registered a protest over the termination of sick leave payments. 216 NLRB at 522. The contrast with the events in the present case is quite significant. Not only did the Board find that Wiegand's threat to cut off benefits was designed to dissuade the union from striking, but the company adamantly adhered to its position despite indications that some disabled workers were not strikers. The union protested to the company that the sick individuals were not strikers, and the record also shows that at least three workers on disability actually telephoned the company to complain when their benefits stopped coming. These callers specifically told the company that they were not on strike, but their inquiries were met with the answer that the cut-off was a firm company policy. This affirmative indication in the present situation that the disabled workers were not in the same position as strikers was, as the Board remarked, absent in *Southwestern Electric.* Moreover, there was no finding in *Southwestern,* as there was here, that the sick leave payments were accrued compensation linked to services rendered in the past.

Factual differences between Wiegand's intentionally retaliatory action and the circumstances in *Southwestern Electric* illustrate that, to the extent Wiegand may have based its action on the prior Board precedent, its reliance was not justified. The narrow decision in *Southwestern* cannot fairly be interpreted to give employers carte blanche to issue coercive pre-strike threats to terminate *accrued* benefits. Such a construction would appear to run afoul of the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S.

26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). Consequently, the Board's determination to overrule *Southwestern Electric* in the present case has not visited an undue hardship on Wiegand. The employer has not been subjected to fines or other penalties. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974). Rather, it merely has been ordered to pay benefits that it was always obligated to pay, because the workers had earned the right to S&A payments before a strike was imminent.

It is firmly settled by the Supreme Court that the Board may overrule its previous decisions in subsequent adjudicatory proceedings, as cumulative experience and wisdom gleaned from legal and industrial evolution warrant rethinking earlier held views. *See e. g., NLRB v. Weingarten, Inc.*, 420 U.S. 251, 264–67, 95 S.Ct. 959, 967–68, 43 L.Ed.2d 171 (1975); *NLRB v. Bell Aerospace Co., supra.* Reliance by one party on past Board decisions does not alter the Board's authority to set aside precedents and apply the new principle to the case at hand. *Bell Aerospace*, 416 U.S. at 295, 94 S.Ct. at 1772. Accordingly, Supreme Court decisions compel the conclusion that, in this case, Wiegand cannot be excused from having committed an unfair labor practice on the basis of possible reliance on a previous Board ruling.

I also write separately to highlight why, in this particular proceeding, we may modify the Board's remedial order despite the extensive deference courts normally accord to such orders.

The Supreme Court has often attested to the breadth of the Board's discretion to devise "remedies to effectuate the policies of the Act." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953). As the Court explained in *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), "[t]he Board's power is a broad discretionary one, subject to limited judicial review.... 'In fashioning remedies to undo the effects of violations of the Act, the Board must draw on enlightenment gained

from experience.' *Labor Board v. Seven-Up Bottling Co.*, 344 U.S. 344, 346 [73 S.Ct. 287, 288, 97 L.Ed. 377]. The Board's order will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' *Virginia Elec. & Power Co. v. Labor Board*, 319 U.S. 533, 540 [63 S.Ct. 1214, 1218, 87 L.Ed. 1568]" (some citations omitted).

This synthesis reveals that although the Board's remedial authority is extensive, it is confined by the very policies that the Board is charged with implementing. Thus, there are two primary constraints on remedial discretion. First, the remedy selected must "undo the effects of violations of the Act," *id.*, rather than perpetuate the unfair labor practice. Second, the Board is not free to adopt a remedy that is at odds with the purposes of and the rights guaranteed by the national labor laws. The Board exceeded both limitations in the present case. Here, the policy that the remedy should have effectuated was the right of employees to support a strike without losing accrued benefits. Yet, the Board's order that the employer could discontinue S&A benefits for active strike supporters in and of itself is inconsistent with the protected right of employees to engage in concerted activity in furtherance of collective bargaining efforts. 29 U.S.C. §§ 157, 158(a)(1) (1976). Moreover, rather than redressing the violation, the Board's remedial order permitted the employer to continue the unfair practice of withdrawing accrued benefits from strike supporters. Thus, the remedy adopted by the Board stands in irreconcilable conflict with its underlying finding that the termination of accrued benefits constituted an unfair labor practice.

Having found that S&A benefits are accrued compensation tied to past service, the Board is not free nevertheless to permit the employer to terminate such benefits for those disabled workers who show support for the strike. The right of employees to support legal strike activity without suffering retaliation or discrimination is at the

heart of the protection embodied in 29 U.S.C. §§ 157 and 158. *See NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). The Supreme Court has squarely held that an employer may not deny accrued benefits to workers who support a strike. *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

The remedial order adopted by the Board, however, leads to the precise result prohibited by the Supreme Court in *Great Dane*: it authorizes the withdrawal of accrued benefits to workers who indicate support for the concerted efforts of fellow employees to withhold their services. Such an action is likely to inhibit strike support, an effect which is fundamentally contradictory to rights protected by 29 U.S.C. § 157. Because the Board's order. patently fails to effectuate the policies of the national labor laws, it is not entitled to the respect which appellate courts usually must grant to remedial choices. The only remedial order consonant with the finding that the S&A benefits were accrued is one that directs the employer to pay these benefits for the entire time a worker remains disabled.

Although I am concerned that an employer should not be placed in the position of financing a strike, the apprehension of the Board that such an order here would be tantamount to requiring Wiegand to finance the strike is not consonant with the finding that the benefits were accrued. An employer can be deemed to be financing a strike against itself only when it must pay compensation that bears the characteristics of wages. Wages are *unaccrued* payments for current services rendered. Since striking employees are withholding current services, the employer need not pay them wages. In contrast, Wiegand's duty to pay the *accrued* disability insurance arises in return for efforts expended by employees in the past. Inasmuch as these benefits are not given in return for current services, the employer's continued payment of S&A benefits to disabled workers, during a strike engaged in by nondisabled workers, cannot fairly be viewed as financing the strike.

Accordingly, I agree with the majority that we should enforce the Board's finding of an unfair labor practice because, under the substantial evidence standard of review, the Board's determination that the S&A benefits were accrued is adequately supported in the record. Once the Board found the S&A benefits to be accrued, the unfair labor practice finding was mandated by the Supreme Court's holding in *Great Dane Trailers.* Similarly, modification of the remedial order is consistent with Supreme Court precedents.